[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This action is the third suit for dissolution of their marriage brought by the 39 year old plaintiff wife against the 42 year old defendant husband. The earliest suit was brought in 1985 but the parties reconciled. The plaintiff testified that, in her opinion, the reconciliation lasted one year. The plaintiff commenced a second suit in 1987, which the plaintiff terminated, she testified, after the defendant threatened to leave the United States of America with their children.
The defendant immigrated to the U.S.A. in 1964 from Portugal. He became a U.S.A. citizen in 1970, the same year that the parties married, which was April 4, 1970 at Waterbury, Connecticut.
The first parcel of real estate purchased by the parties was a building lot located in Naugatuck, Connecticut, for a purchase price between $5000 and $6000 cash. The parties still own the lot in joint names which the plaintiff now values at $40,000, and the defendant values at $60,000. It is free of mortgage. The parties originally intended to build a home on the lot but didn't for they decided to buy a two-family home instead, located at 131 Lakeview Avenue, Waterbury, at a cost of $36,000, with $16,000 cash down and the balance mortgaged in March, 1971. Title was taken in the defendant's name. He sold the property to his parents in 1987 for $50,000, subject to a $14,000 mortgage. The defendant retained the $36,000 cash proceeds.
After living in the Waterbury home for ten years, the parties moved to 28 Lombard Drive, Prospect; a large one-family home purchased for $80,000. The property is now valued by the plaintiff at $225,000, and at $300,000 by the defendant. It is subject to two mortgages totaling about $138,000. The mortgages are not current.
The defendant refinanced the Lombard Drive house to raise $100,000 to purchase, and subsequently sell, a parcel in Torrington. He shared the profits with plaintiff. Since then the defendant borrowed $98,000 in similar fashion but was unable to recall what he CT Page 2256 did with $50,000.
The parties purchased condominium unit D on the tenth floor of Edificio Acropole situated in Avenue Tomas Cabreiro on Praia da Rocha, Portimao, Portugal, (plaintiff's Exhibit A), which is an ocean front resort. Title was taken in both names. The defendant valued it at $33,000 U.S. on his financial affidavit, subject to a mortgage valued at $13,000 U.S., and which the plaintiff's expert witness valued at $62,000 to $64,000 U.S. fair market value.
Subsequently, the defendant acquired two more condominium units known as Apt. B, 3rd floor, and Apt. E, 2nd floor, Edificio Acropole, in June, 1988, (plaintiff's Exhibit B), a garage space, and, finally, a vacant commercial lot next to the condominium (plaintiff's Exhibit C) for 1,000,000 escudos. In January, 1990, the plaintiff sold the lot for 1,250,000 escudos (plaintiff's Exhibit D). To assist the court, it appointed attorney Americo Santos committee, to translate plaintiff's Exhibits A, B, C and D into the English language from the original Portuguese language. The court finds his fee of $750 to be reasonable and will order it paid by the defendant as part of the judgment. The committee advised the court that one U.S. dollar equals 150 escudos. The plaintiff's witness valued unit B and unit E as worth $50,000 each, and the lot to be worth between $79,000 to $80,000 U.S. By converting the escudo to the U.S. dollar, the court finds that actual sale price exceeded $83,000. The defendant asserts units B and E belong to the two children of the parties, that they are each worth $35,000, and that the vacant lot is still owned by defendant and is worth $10,000. This assertion by defendant is contradicted by Exhibit D.
The defendant, with a partner named Jose Francisco, purchased the "New Era Court Apartments" from HUD in 1982 and refinanced the mortgage in December, 1986, defendant thereby being able to receive $376,000 at the closing. Some of the proceeds were invested in Portugal and some in Connecticut, but a complete explanation of the disposition of the proceeds was not brought out in the trial. The defendant subsequently started litigation against Mr. Francisco and defendant's affidavit states plaintiff's equity in the partnership assets to be $125,000, less tax liabilities and costs, with $75,000 estimated as net equity.
By court order entered October 6, 1989 (Heiman, J.), the court ordered any money received from Mr. Francisco to settle the litigation to be held in an interest bearing account with the parties' attorneys as co-trustees. This escrow was funded by stipulation dated February 22, 1990.
The defendant's affidavit further states that defendant invested about $180,000 U.S. funds in a real estate purchase in Alvore, Portugal, which has never closed due to "legal complications", CT Page 2257 because "the contractor when bankrupt".
The defendant has been an insurance agent for John Hancock for twenty-one years, selling insurance and mutual funds. He also held a real estate agent's license for a period of time but surrendered it about two years ago. During 1986 and 1987, the defendant was active in buying and selling real estate, which the court will discuss infra. In 1987, he had an emotional breakdown, was taking librium, and was unable to work for about one year, and qualified for disability benefits. Prior to this health problem, he had back surgery in both 1984 and 1985. His interrogatory answer stated that he was in "excellent" health.
During 1986, the defendant bought a Rhoda Avenue, Waterbury parcel for $36,000 and sold it one year later for $60,000.
During 1986, the defendant bought an Oak Street, Waterbury parcel for $80,000 with 100% financing, and sold it a year later to his parents for the same price. The court infers that this was not an arm's length transaction.
The defendant dealt with a parcel known as Lakeview Avenue that he sold to his parents, which they resold and from which the defendant ultimately realized a profit of about $85,000.
There was another transaction in Torrington in which defendant and plaintiff did divide the profit.
During 1986, the defendant purchased lots in Torrington with a partner for $26,000. The partner later quit-claimed his interest to the defendant. The defendant could not recall the selling price of the lots when they were sold in 1987.
The defendant is again working, having regained his health, and states his averaged commission, after taxes, to be $280 net weekly.
The plaintiff is a licensed hairdresser and was a licensed real estate agent. Also, the plaintiff is presently studying to become an L.P.N. The plaintiff was actively engaged in assisting her husband in his real estate ventures from 1983 until 1988. The court concludes that both parties contributed to the assets the parties acquired during the marriage. The court concludes that the marriage began to break down during 1985 when defendant admitted to plaintiff that he had an affair with a woman in New Jersey. The court concludes that the marriage never fully recovered after this breakdown.
After the first divorce action, the defendant dealt in real estate in his name alone. The defendant's course of conduct was to shield his dealings and profits from the plaintiff. During the CT Page 2258 trial, the court found the defendant to be less than reliable in some of his testimony and at times evasive; and the court further observed the plaintiff to be most suspicious of the defendant's testimony and, at times, of the court process itself.
The defendant also has attempted to shield assets from the plaintiff by claiming the two units in Edificio Acropole that he purchased in 1988 were given to the two children. The defendant placed 2,500 shares of Eagle Financial Corporation common stock in each child's name (plaintiff's Exhibit Q). The closing stock quote on September 16, 1990 was 8-5/8 per sharp.
The court, having reviewed the evidence, the financial affidavits and the plaintiff's exhibits, concludes that the defendant's financial affidavit is not accurate in some respects, e.g. the commercial lot in Portugal, and he forgot his retirement pension with John Hancock when answering plaintiff's disclosure. The court finds the plaintiff to be the more credible witness.
The court finds the defendant to be primarily responsible for the breakdown of the parties' marriage.
The parties stipulated to a custody settlement on March 23, 1990, in open court, which the court accepted.
Having examined the evidence, evaluated the credibility of the witnesses and considered the statutory criteria, the court enters the following decree:
1. A judgment may enter on the plaintiff's complaint dissolving the parties' marriage on the ground of irretrievable breakdown.
2. (a) The plaintiff is awarded sole ownership and possession of 28 Lombard Drive, Prospect, Connecticut, together with all of the contents therein except for defendant's clothing and personal effects.
(b) The defendant shall be responsible for the taxes and mortgage payments due on the said property, to and including the date this memorandum is filed. The plaintiff shall assume and be responsible for the mortgages, taxes, insurance premiums thereafter falling due, and shall hold the defendant harmless from any such future claims.
(c) The defendant shall vacate the premises on or before October 15, 1990.
3. The lot located on Evelyn Drive, Naugatuck is ordered to be sold immediately and the net proceeds to be divided equally CT Page 2259 between the parties. If the parties cannot agree on the price or other details of sale, either party may seek an articulation. The parties are also free to reach a buy-out, if arrived at voluntarily, in lieu of placing the property on the open market.
4. The plaintiff shall convey her interest in condominium apartment D 10th floor in Edificio Acropole to the defendant who shall assume sole responsibility for the mortgage, taxes and any other claims thereon, and defendant shall hold plaintiff harmless from any such claims of creditors.
5. From the escrow, created by the stipulation dated February 22, 1990 as on file, shall be paid to plaintiff the sum of $80,000 as compensation for the monies defendant transferred to Portugal from time to time. The balance of the escrow shall then be released to the defendant.
6. (a) The plaintiff is awarded a 45% interest in the defendant's pension as it existed on January 1, 1989. Counsel for the defendant shall prepare a proper order for the court's signature, after submitting same to plaintiff's counsel for review.
(b) The plaintiff is awarded the same 45% interest in the defendant's account #518680-6 (plaintiff's Exhibit R) John Hancock Bond Trust HR-10 Retirement Plan.
(c) By these orders, it is the court's intention to give plaintiff a vested interest in 45% of all of defendant's pension benefits as they existed on January 1, 1989.
7. Joint custody of the one minor child is ordered, with his primary residence to be with plaintiff. The court adopts the specific visitation schedule agreed to by the parties which is annexed hereto as Appendix A.
8. (a) The defendant shall pay child support to the plaintiff in the amount of $76 weekly to be secured by an immediate wage execution, P.A. 89-302. In arriving at the order of child support, the court utilized the defendant's net earnings of $280 and charged plaintiff with a net earnings capacity of $100 based on her testimony, although her financial affidavit lists less. The child support guidelines were considered, P.A. 89-203.
(b) The defendant shall cover the minor child on all available medical coverages he presently has through John Hancock. If he has no coverages for any reason at any time, he shall furnish Century 90 Blue Cross/Blue Shield coverage or the equivalent for the minor child. This order is subject to Section 46b-84 (c), General Statutes. Any remaining bill balances for medical care of the minor shall be borne and paid equally by the parties. CT Page 2260
9. The defendant shall pay periodic alimony to the plaintiff in the weekly amount of $50 until the plaintiff remarries or until the death of either party. This order is also to be secured by a wage withholding order.
10. The defendant shall pay any unpaid balance due on the temporary order for a food allowance of $160 weekly through the last week of September, 1990. Any unpaid balance shall be an arrearage to be paid.
11. Each party shall be solely responsible for and pay their respective debts as listed on their respective financial affidavits, and each shall save the other party harmless and indemnified.
12. Counsel for the minor child has been awarded $2600 for his services, by order entered March 23, 1990. The defendant shall pay said counsel the sum of $2000 in four equal installments, in thirty, sixty, ninety and one hundred twenty days from the date hereof. The plaintiff shall pay the remaining $600 in six equal monthly installments, beginning on November 1, 1990.
13. The defendant shall pay the committee appointed to have the exhibits translated, Attorney Americo Santos, the sum of $750 in three installments due on November 1, 1990, December 1, 1990, and January 2, 1991.
14. The parties shall absorb their respective litigation expenses.
Counsel for the plaintiff shall prepare the judgment file.
HARRIGAN, Judge
APPENDIX A
MR. COHEN: Essentially, the agreement provides for joint legal custody. Primary residence with the mother.
The parties have agreed on a specific visitation schedule with respect to holidays, which I would like to read into the record. They have agreed that the parties will alternate major holidays and alternate years. For 1990 the holiday visitation will be, Memorial Day weekend will be with the father. The Fourth of July would be with the mother this year, except there's going to be a trip out of the country with the father, which I CT Page 2261 will recite in a moment. Labor Day will be with the father. Thanksgiving will be with the mother. The father will have Christmas vacation, which will include the New Year's holiday in 1990. Then in 1991 we will start again with mother will have Easter. Mother will also have Easter of this year. I'm sorry. So in 1991 Easter will go with the father. That will alternate, the schedule for 1991.
The parties have also agreed that the following special visitation will take precedence over any regular scheduled visit; that is, Father's Day will always be with the father. Mother's Day will always be with the mother.
The parties will share the child's birthday. And they have further agreed that if a weekend visit falls on a weekend in which there's a Monday holiday, then whichever parent has the child for that weekend will have the child through Monday evening.
The father will have the right to have the child with him for four weeks during the summer. During 1990 the father has elected and mother has agreed that shall include all of the month of July. So that — The father intends to take the child to Portugal to visit his paternal grandparents. For that reason the mother has agreed to forego the Fourth of July holiday this year.
In future years the father and mother will agree by May 15 of each year in which four weeks during the summer they will have. The parties will also agree between themselves on sharing school vacations other than the summer vacation which we have already referred to and the Christmas vacation which we have already referred to.